IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| GARY WALLACE,<br>    **Plaintiff,**<br><br>v.<br><br>GEORGE ARIAS,<br>    **Defendant.** | CIVIL ACTION<br><br><br><br>NO.  23-3243 |

<u>MEMORANDUM</u>

**HODGE, J.**                                                                                          **January 5, 2026**

Plaintiff Gary Wallace ("Wallace"), *pro se*, filed an Amended Complaint against George Arias ("Arias"), in his individual and official capacity, alleging Section 1983 retaliation for asserting his First Amendment rights under the U.S. Constitution. (ECF No. 13.) Arias has moved for summary judgment (ECF No. 57), which Wallace opposes (ECF No. 68). For the reasons that follow, the Motion is denied.

**I.       BACKGROUND**[1]

In the summer of 2022, Wallace was incarcerated at SCI-Chester. (ECF No. 68 at 2 ¶ 5.) On July 22, 2022, Wallace received a misconduct report (Misconduct D598090) ("Misconduct 1") written by Arias for an incident Wallace had with Greg Bell ("Bell"), a Program Supervisor at SCI-Chester. (ECF No. 57-1 ¶ 1.) Misconduct 1 stated that Bell reported to Arias that Wallace had attempted to get Bell to smuggle a smartwatch with phone capabilities into the facility, which is contraband. (ECF No. 57-6 at 6.) Bell informed Arias that Wallace repeated this request on seven separate days ranging from July 14, 2022 to July 22, 2022. (*Id.*) As a result of Misconduct 1, Wallace was escorted to the restricted housing unit. (ECF No. 68 at 2 ¶ 5.)

---

[1] The Court adopts the pagination supplied by the CM/ECF docketing system.

A disciplinary hearing was held on July 26, 2022 at 1:44 p.m., at which Misconduct 1 was dismissed without prejudice. (ECF No. 57-6 at 5.) At 4:45 that evening, Wallace received another misconduct report (Misconduct D290677) ("Misconduct 2") written by Bell regarding Wallace's requests to Bell to smuggle in a Vtech smartwatch. (ECF No. 57-6 at 11.) Bell attached an email to Misconduct 2 that he sent to his supervisor on July 22 requesting that Wallace be removed from his unit because he is "constantly causing problems," "ma[king] the community and [his] fellow counselor quite uncomfortable with things he says and does," and that "he is more of a hinderance tha[n] any kind of help." (ECF No. 57-6 at 14.)

On July 27, Wallace attended a Periodic Review. (ECF No. 68 at 31.) Superintendent Gina Clark ("Clark") provided written instruction to release Wallace back to the general population from the restricted housing unit. (*Id.* at 2–3 ¶ 8; *id.* at 31.) The instructions noted that because Misconduct 1 was dismissed without prejudice, it may be refiled. (*Id.* at 31.) However, Wallace remained in the restricted housing unit. (*Id.* at 3 ¶¶ 9–10.)

Wallace attended a disciplinary hearing on July 28 at 12:05 p.m., at which Misconduct 2 was dismissed without prejudice because it was not re-written by the original officer. (ECF No. 57-6 at 10.) At 8:30 that evening, Wallace received an "Other" report (D802417) written by Arias placing him in administrative custody. (ECF No. 57-6 at 3.) The report states: "The inmate has been charged with, or is under investigation for a violation of facilities rules, and there is a need for increased control pending disposition of charges or completion of the investigation." (*Id.*)

Later that day, after receiving the "Other" report, Wallace wrote an "Inmate's Request to Staff Member," Form DC-135A ("Inmate's Request"), to Clark. (ECF No. 57-7 at 2.) In his Request, Wallace stated that "Lt. Arias is using the power of the security office to punish me because the misconducts were dismissed. This is a clear abuse of power." (*Id.* at 2–3.) He further

2

wrote: "This is clearly being done in retaliation because [Arias] did not get the result he wanted at the hearing, he is using the awesome power of his station to punish me[.] Please do not allow this to go on." (*Id.* at 3.)

On July 29, Bell emailed Arias with the subject line "As per your request," to provide "the 141 typed up"—referring to the form used for the Misconduct as well as the "Other" report. (ECF No. 68 at 53.) Arias responded to the email on August 2 at 11:12 a.m. stating "call me asap." (*Id.*) At 1:10 p.m. that day, Wallace received another Misconduct (Misconduct D802426) ("Misconduct 3") with a typewritten summary of the staff member's version of events. (ECF No. 57-6 at 8–9.) A misconduct hearing was held on August 4 at 11:05 a.m., at which Misconduct 3 was dismissed because "[p]er policy, the misconduct is to be written the day the staff member becomes aware of it. He waited over a week until his supervisor came back." (ECF No. 68 at 42.) This dismissal did not state it was without prejudice. (*Id.*)

Later that day at 3:40 p.m., Bell submitted an employee report of an incident requesting separation of Wallace. (ECF No. 57-5 at 6.) In the description, Bell wrote that since Wallace has been in restricted housing, "I have been informed by inmate [redacted] that inmate has indicated that once he is taken out of the [restricted housing] he is determined to exact revenge on myself for having reported him." (*Id.*) Also on August 4, with no time specified, security staff at SCI-Chester received a report from an anonymous inmate stating that Wallace was in danger once he would be released to the general population. (*Id.* at 12.) Specifically, the anonymous inmate wrote: "[t]he kings are gonna smash Wallace when he get out of the hole." (*Id.*) Bell had also emailed Arias the day prior, writing "as per your request I am sending this reminder that we need to set up an interview for Separation." (ECF No. 68 at 55.) A subsequent email chain on August 8 between Arias and Bell states that Arias was available for the interview to start on August 9. (*Id.* at 56.)

3

On August 10, Wallace attended a periodic review with Clark. (ECF No. 68 at 6 ¶ 27; *id.* at 46.) Clark informed Wallace he was being transferred, and the report from the periodic review notes that the transfer was approved on that day. (*Id.* at 6 ¶ 27; *id.* at 46.)

Arias completed an investigation memorandum on August 18, 2022. (ECF No. 57-5 at 2.) The memorandum states that it was predicated on Bell's fear of Wallace retaliating against Bell for reporting him to security, as well as the report from the anonymous inmate stating that Wallace's safety was also at risk. (*Id.* at 2–3.) Part of the investigation included a written statement from Bell, received on August 10, regarding his fear for his safety. (*Id.* at 3.) The report states that Arias attempted to interview Wallace on July 23 and August 18, and that Wallace would not speak to security. (*Id.* at 4.) On August 13, Wallace was issued a "DC-ADM 802, 1B1A: Inmate is in danger of some person(s) and cannot be protected by alternate measures." (*Id.*) The report recommends Wallace's transfer. (*Id.*)

The Office of Population Management approved the transfer on September 20, 2022. (ECF No. 57-3 at 2.) The approval stated the following as the rationale for the transfer: "Inmate Wallace on more than one occasion has tried to convince GEO TC Counselor Bell to bring contraband into the facility. Mr. Bell has requested a separation from Inmate Wallace and he fears for his safety if he is released to GP here at CHS." (*Id.* at 3.)

Wallace filed Grievance No. 1001938 on September 30, 2022, complaining of his transfer from SCI-Chester. (ECF No. 57-8 at 2.) In his Grievance, Wallace asserted that Arias retaliated against him for exercising his First Amendment right to file a complaint about his conduct. (*Id.*) He states that as a result of his transfer to SCI-Coal Township, he is now over four hours away from his family, lost his job, and was labeled as a danger to staff. (*Id.* at 3.) Wallace's Grievance was denied on October 14, 2022, because it was not submitted within fifteen working days after

4

the events upon which the claims are based. (*Id.* at 4.) Wallace appealed this decision on March 10, 2023, asserting he had no knowledge of the denial prior to March 3, 2023. His appeal was denied, which further stated that Wallace was "transferred because [he] violated the rules of this facility by soliciting staff to bring in contraband." (*Id.* at 16.) Wallace appealed that denial to Clark, asserting that the record does not support that his transfer was for a rule violation. (*Id.* at 17–18.) The Final Appeal Decision on July 27, 2023 denied Wallace relief and stated "[t]he record reflects that your transfer was initiated due to security reasons and that Lt. Arias acted within the scope of his duties." (*Id.* at 23.)

Wallace is currently incarcerated at SCI-Camp Hill. (ECF No. 68 at 2 ¶ 4.) He avers that he has been in the custody of the Department of Corrections for over twenty-seven years and has no history of staff or inmate assault during that time. (*Id.* at 9 ¶ 37.)

## II.   LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). An issue is "genuine" if the evidence is such that a reasonable jury could return a verdict for the non-movant party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A factual dispute is "material" if it might affect the outcome of the case under governing law. *Id.*

A party seeking summary judgment bears the initial responsibility for informing the district court of the basis for its motion and identifying portions of the record that it believes demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Where the non-movant bears the burden of proof, the movant's initial burden can be met by "pointing out to the district court that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325. After the movant has met its initial burden, the non-movant's response

must, by "citing to particular parts of materials in the record," show that a fact is "genuinely disputed." Fed. R. Civ. P. 56(c)(1). Summary judgment is appropriate if the non-movant fails to rebut by making a factual showing "sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322. Under Rule 56, the Court must view the evidence presented on the motion in the light most favorable to the opposing party. *Anderson*, 477 U.S. at 255.

### III. DISCUSSION

Arias raises four arguments on summary judgment: (1) he lacked the authority to transfer Wallace and so cannot be liable for it; (2) the transfer would have happened absent the protected conduct for reasons reasonably related to penological interests; (3) some of the adverse actions—specifically, the Misconducts—occurred before Wallace engaged in the protected conduct and so they cannot constitute retaliation; and (4) Wallace failed to exhaust his administrative remedies regarding the Misconducts' status as adverse actions. Wallace's response avers that he is not asserting that the Misconducts were retaliatory. Therefore, Arias's third and fourth arguments are not applicable, as Wallace's retaliation claim is solely focused on the transfer as the allegedly retaliatory action.

#### A.  Arias's Authority to Transfer Wallace

Arias argues that a defendant can only be liable under Section 1983 if they "have personal involvement in the alleged wrongs." (ECF No. 57 at 4 (quoting *Rode v. Dellacripete*, 845 F.2d 1195, 1207 (3d Cir. 1988)). Arias recommended Wallace's transfer and prepared the transfer report, but he asserts that he lacked authority or power to cause the transfer, and that the transfer was then approved by Clark and the Office of Population Management. Because he lacked final authority to effectuate the transfer, Arias asserts that he cannot be held liable for it.

Arias's argument is misdirected. The incomplete quotation from *Rode* further states: "liability cannot be predicated solely on the operation of *respondeat superior*." 845 F.2d at 1195. Wallace does not assert that Arias is vicariously liable for the transfer—he asserts that Arias recommended his transfer in retaliation to Wallace's protected conduct. There is no dispute that Arias recommended the transfer, and therefore, he had personal involvement in the transfer. Thus, Wallace's assertion is not based on "mere inference based upon speculation or conjecture." (ECF No. 57 at 5.)

Instead, the relevant question is whether Wallace suffered an adverse action "at the hands of" Arias. *See Rauser v. Horn*, 241 F.3d 330, 333 (3d Cir. 2001). Liability under Section 1983 "requires that the defendant . . . have exercised power possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law." *Zelinski v. Pa. State Police*, 108 F. App'x 700, 703 (3d Cir. 2004) (quoting *Bonenberger v. Plymouth Twp.*, 132 F.3d 20, 23 (3d Cir. 1997)). A lack of authority under state law to take an adverse action may prevent a plaintiff from establishing a causal link between the protected conduct and the eventual deprivation of rights. *Stewart v. Cardone*, No. CV 15-6360, 2016 WL 311261, at *3 (D.N.J. Jan. 26, 2016). For example, in *Kantamanto v. King*, 651 F. Supp. 2d 313 (E.D. Pa. 2009), the plaintiff asserted that a corrections officer fired him from his position in the library due to an article he wrote about conditions in the facility. The defendant disputed this account and further asserted that only a social worker had the authority to hire or fire employees. *Id.* at 326. The court found there to be a dispute of material fact as to whether the corrections officer caused the plaintiff's termination, and denied summary judgment. *Id.*

Here, there are disputes of material fact as to whether Arias's recommendation of the transfer caused the transfer. Arias's efforts to downplay the impact of his recommendation

7

attempts to ignore that no evidence has been presented that suggests Wallace would have been transferred if not for Arias's recommendation. Arias had the power to recommend Wallace's transfer, did so, and that recommendation was taken seriously because of the "power or position granted by the state." *Bonenberger*, 132 F.3d at 24. If Arias's transfer recommendations are often overruled by his superiors, that may not constitute an adverse action "sufficient to deter a person of ordinary firmness from exercising his [constitutional] rights." *Rauser*, 241 F.3d at 33. However, because facts remain in dispute as to whether Arias's recommendation caused the adverse action taken against Wallace, summary judgment cannot be granted on these grounds.

**B.     Whether There Were Legitimate Penological Reasons for the Transfer**

Where a prisoner plaintiff makes out a prima facie case of retaliation, a prison official defendant can present an affirmative defense that the action impinging on the prisoner's constitutional rights is "reasonably related to legitimate penological interests." *Rauser*, 241 F.3d at 334. If a prison official makes this showing, it defeats the retaliation claim. *Carter v. McGrady*, 292 F.3d 152, 159 (3d Cir. 2002). This affirmative defense exists because "[s]ubjecting the day-to-day judgments of prison officials to inflexible strict scrutiny analysis would seriously hamper their ability to anticipate security problems and to adopt innovative solutions to the intractable problems of prison administration." *Turner v. Safley*, 482 U.S. 78, 89 (1987). However, even where there is factual support for the proffered legitimate penological reason, a reasonable fact finder could still conclude that an adverse action was in retaliation for protected conduct and not in furtherance of the legitimate penological goals. *See Watson v. Rozum*, 834 F.3d 417, 426 (3d Cir. 2016).

Arias asserts that Wallace was transferred for safety reasons. Specifically, Bell requested the transfer because he feared Wallace would retaliate for the Misconducts. Additionally,

Wallace's safety was at risk according to the anonymous inmate report that Wallace was in danger once he returned to the general population. Proactively reducing tensions between guards and inmates is a legitimate goal for prison administrators. *Mincy v. Klem*, 277 F. App'x 239, 243 (3d Cir. 2008). In opposition, Wallace asserts that a reasonable jury could find that Arias's safety argument is pretextual, as much of the evidence suggesting safety concerns postdate Wallace's notification that he was being transferred.

A reasonable jury here could conclude that the purported legitimate penological interests were pretextual. There is no evidence presented that safety concerns existed prior to August 4—mere days after Wallace's Inmate's Request and after the last Misconduct was dismissed which would release Wallace from administrative custody. Bell's July 22 email complaining about Wallace requested his removal from Bell's unit because "he is more of a hinderance tha[n] any kind of help" (ECF No. 57-6 at 14)—not because Bell feared for his safety. The suspicious timing and suddenness of the safety concern, along with the collaboration between Bell and Arias and their silence in the evidentiary record, presents an issue of factual dispute that would permit a reasonable jury to find that the transfer was retaliatory and not in furtherance of legitimate penological goals.

IV. **CONCLUSION**

For the foregoing reasons, Defendant's Motion for Summary Judgment is denied. An appropriate Order follows.

BY THE COURT:

/s/ Hon. Kelley B. Hodge
_____
**HODGE, KELLEY B., J.**